J-A11023-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MICHELLE Z. SHEPPARD | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JON R. SHEPPARD | : | |
| | : | |
| Appellant | : | No. 1303 MDA 2023 |

Appeal from the Order Entered August 15, 2023
In the Court of Common Pleas of Dauphin County
Domestic Relations at No:  01307-DR-22

BEFORE:  BOWES, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY STABILE, J.:                **FILED: SEPTEMBER 10, 2024**

Jon R. Sheppard (Father) appeals a support order entered by the Court of Common Pleas of Dauphin County (trial court).  He argues that the trial court erred in calculating the support amounts by holding him to an inflated earning capacity well above his actual income levels.  We affirm.

In 1999, Michelle Z. Sheppard (Mother) and Father were married.  The married produced four children, two of whom are minors.  Mother and Father separated in 2022, and Mother filed a complaint for child support.  A support conference was held on January 6, 2023, and on February 24, 2023, Father was ordered to pay Mother child support in the amount of $740 ($673.00 per month, plus $67.00 per month on arrears).  This support amount was based on Father's reported annual earnings of $32,000.00 the prior year.

Mother filed a demand for a trial *de novo* on March 16, 2023, contending that Father's support amount should have been determined from an earning

capacity that exceeded his reported income. A trial *de novo* was held on July 10, 2023. At those proceedings, the trial court made the following findings of fact:

**(A) Father's childcare responsibilities and expenses:**

None provided. Both children are of an age that childcare is likely no longer an issue.

**(B) Father's assets:**

None provided. There was no testimony as to Father's individual assets such as pension, retirement accounts, separate bank accounts, or entitlements *etc*. There was testimony as to his earning capacity and that will be discussed *infra*.

**(C) Father's residence:**

The Father resides [in] Hershey, PA. The Court heard no testimony as to the value of the property or the current mortgage balances. As such, the Court is unaware if there is any equity. The Court was made aware that an Act 91 notice was recently served upon Father and that Father intends on filing for both personal and business bankruptcy soon.

**(D) Father's employment and earnings history:**

Father is the owner of two businesses, Fair Havens Management, LLC, and Sheppard & Sons Builders Inc. It appears that prior to 2020, Father would have been making anywhere between $200,000.00 and $400,000.00 per year. We note that we have the business account statements for both companies and can see that Father was using his businesses as a "personal piggybank."

For instance, in fiscal year (Oct. 1-Sept. 30) 2017-2018, Father shows a loss for Sheppard & Son Builders, Inc. of $148,698.00. However, he took a personal salary of over $164,000.00. The purpose of reviewing the spouses' business transactions in determining their support obligations is to prevent one or the other from sheltering actual personal income that should be included in calculating support.

- 2 -

It was testified at the hearing that Father's businesses took a hit from the 2020 COVID declaration of emergency by the PA Commonwealth (March 16, 2020) as neither business was "essential." Further, Father testified that his contracting business was looted of approximately $850,000.00 in the 2017-2019 range. Both these incidents effectively spelled the death knell for his businesses and marriage.

We are not going to add back personal expenses into Father's proposed earning capacity, but we are assigning this apparent discrepancy to his credibility. For example, there was no testimony from Father as to how purchases at Walmart, Sam's Club, Amtrak, and Karns *et al.* were each specifically regarded as to a personal or business expense, and perhaps that's the Court's point, when determining the expenses of a business on a self-created [profit and loss] statement.

**(E) Fathers job skills**:

We took testimony from an expert in vocational skills and earning capacity. We found the experts, Brian Bierley, methodology and analysis to be sound and his testimony credible. Father has amassed skills in finance and in general contracting throughout a 30 plus year career.

**(F) Father's educational attainment:**

Father graduated high school in 1977. He attended Penn State University and graduated in 1981 with a bachelor's degree in finance. He obtained his master's degree in finance in 1992 from Drexel University.

**(G) Father's literacy:**

Father has an above-average level of aptitude in the areas of general education, verbal aptitude, and mathematical ability.

**(H) Father's age**: Sixty-four (64) years.

**(I) Father's health**: No testimony regarding this factor.

**(J) Father's criminal record and other employment barriers:**

No criminal record or other extrinsic employment barriers.

**(K) Father's record of seeking work:**

Father only applied for seven (7) jobs in a three (3)-month period. Mother testified that Father told her "He'd rather go to jail than

pay her child support." The Court has considered this statement in the context of Father's credibility.

**(L) The local job market, including the availability of employers who are willing to hire the party:**

The expert provided data that in finance vocations, the local unemployment rate was only 2.6%, which is much lower than other jobs in the local area at 4.7%. We do not hold Father to a vocational capacity only in finance, but also for small and medium sized contracting companies. He has the capacity to do either.

**(M) The local community prevailing earnings level:**

The expert opined that Father could earn roughly $100,000.00 to $122,000.00 in the local area (Philadelphia and DC metro areas) for an occupation in the loan and finance Industry. Father applied for and received $21,458.00 in 2020 under the federal government's payroll protection plan ("PPP") and $20,832.00 In 2021 for one quarter. This equates to a salary replacement of $100,000.00 per year. The U.S. Bureau of Labor and Statistics indicates a median salary for finance with a master's degree at $81,000.00. Father has 30 years of experience in the construction and the finance Industry.

However, on rebuttal, Father offered that he wasn't cut out for the finance industry because he was only inquiring with friends that were giving him "lip service" and he hadn't been in the "finance game" for many years. We have considered this and Fathers credibility in arriving at Fathers earning capacity.

**(N) Other relevant factors:**

Father has an extensive connection with the local market through his work as a private contractor and construction manager through his family's business for many years. It is an understatement to construe him as anything less than capable in his areas of education through both formal and informal means. This Court has measured its final determination as to Father's earning capacity against the expert's analysis through the U.S. Bureau of Labor and Statistics, Father's own application for PPP funds in 2020/2021, and the expert's conclusion.

Trial Court Opinion and Order, 8/14/2023, at 1-4 (internal citations and footnote omitted).[1]

Based on the above findings, the trial court held Father to an earning capacity of $85,500.00 for 2022, and $88,000.00 for 2023. ***See id***., at 4. The trial court entered an order on August 15, 2023, increasing Father's monthly support obligation accordingly.[2]

Father timely appealed the trial court's order, and in response, the trial court filed a 1925(a) statement and supplement to memorandum and order, summarizing its findings:

> 1. The Trial Court did not find that [Father] was earnestly seeking work when he only applied to seven (7) jobs in a three (3) month period. Further, [Father] stated that he would prefer jail over providing financial support to [Mother]. The Court found [Mother] to be credible in her testimony on this point.
>
> 2. The Trial Court did not base [Father's] assigned earning capacity on his prior income as much as it relied upon the expert witness. The vocational expert testified that [Father] could make between $ 100,000.00 and $122,000.00 in the Philadelphia and DC areas. The Trial Court then decreased those amounts to account for the decreased salaries in the Central Pennsylvania market. Other factors such as [Father's] PPP Loan information support an even higher earning capacity. Also, [Father] is behind on his personal and business tax returns, which also leads the

---

[1] An additional claim for alimony *pendente lite* and spousal support was made by Mother on June 26, 2023, but the portion of the order relating to spousal support is not at issue in this appeal.

[2] Effective November 22, 2022, Father was ordered to pay Mother $1345.00 per month for child support, plus $134.00 per month on arrears. Effective January 1, 2023, Father was ordered to pay Mother $1343.00 for child support, plus $135.00 per month on arrears. Effective June 26, 2023, Father was ordered to pay Mother $1257.00 for child support.

Court to believe there may be additional income available for support purposes.

      3. As stated above, the Trial Court discounted the Metropolitan based salary amounts calculated by the vocational expert to account for jobs in the Central Pennsylvania job market.

      4. The Trial Court noted that [Father] himself concentrated on finding jobs in the finance industry in that all seven of his job applications were in the finance industry.

Trial Court 1925(a) Statement, 10/3/2023, at 1-2.

In his appellate brief, Father now raises four issues in his brief for our consideration:

      1. Did the trial court err when it held Father to an earning capacity of $85,500.00 in 2022, and $ 88,000.00 in 2023, when the testimony presented showed that Father was actively pursuing employment opportunities by submitting job applications, interviewing, and working with head-hunters?

      2. Did the trial court erroneously determine that Father had made $200,000.00 and $400,000.00 per year prior to 2020 and erroneously consider that when determining Father's earning capacity?

      3. Did the trial court err when it found Mother's expert Brian Bierley, credible and further found that he used a "sound" methodology and analysis despite the fact Mr. Bierley used a Philadelphia market for ascertaining Father's range of income, rather than the Central Pennsylvania market where Father resides and works?

      4. Did the trial court err in relying on the U.S. Bureau of Labor and Statistics for a median salary in finance with a Master's degree, and in finding that Father has 30 years of experience in the construction and finance industry, as Father has not worked in the finance industry in years?

Appellant's Brief, at 14-15 (suggested answers omitted).

A support order, including the amount of support awarded, is reviewed under an abuse of discretion standard:

When evaluating a support order, this Court may only reverse the trial court's determination where the order cannot be sustained on any valid ground. We will not interfere with the broad discretion afforded the trial court absent an abuse of the discretion or insufficient evidence to sustain the support order. An abuse of discretion is not merely an error of judgment; if, in reaching a conclusion, the court overrides or misapplies the law, or the judgment exercised is shown by the record to be either manifestly unreasonable or the product of partiality, prejudice, bias or ill will, discretion has been abused. In addition, we note that the duty to support one's child is absolute, and the purpose of child support is to promote the child's best interests.

*Sichelstiel v. Sichelstiel*, 272 A.3d 530, 534 (Pa. Super. 2022) (quoting

*Silver v. Pinskey*, 981 A.2d 284, 291 (Pa. Super. 2009) (*en banc*)).

"The assessment of the credibility of witnesses is within the sole province of the trial court." *Brotzman-Smith v. Smith*, 650 A.2d 471, 474 (Pa. Super. 1994). In addition, the fact-finder is "entitled to weigh the evidence presented and assess its credibility." *Murphy v. Murphy*, 599 A.2d 647, 653 (Pa. Super. 1991).

Here, Father's first claim is that the trial court abused its discretion in calculating his earning capacity to be $85,500.00 and $88,000.00 in 2022 and 2023, respectively. He argues that the evidence shows that he had struggled financially for the preceding years, and that his support obligations should have been based on his reported income of $32,000.00 per year. According to Father, "the uncontradicted testimony showed" that he applied to dozens of positions in different industries; that his construction business was no longer viable; and that he was unsuccessful in his job search despite his diligence. *See* Appellant's Brief, at 29. We find no merit in Father's claim.

- 7 -

A parent is generally liable for the support of minor children. *See* 23 Pa.C.S.A. § 4321. The amount of support is based on the reasonable needs of the child or spouse seeking support, as well as the as the net incomes of the parties. *See* Pa.R.C.P. 1910.16-2; 23 Pa.C.S.A. § 4322(a). But where it is determined that a party has willfully failed to "maintain appropriate employment," the trier-of-fact "may impute to the party an income equal to the part's earning capacity." Pa.R.C.P. 1910.16-2(d)(4)(i). An assessment of earning capacity requires the trier-of-fact "to determine a reasonable work regiment based upon the party's relevant circumstances, including the jobs available within a particular occupation, working hours and conditions, and whether a party has exerted substantial good faith efforts to find employment." Pa.R.C.P. 1910.16-2(d)(4)(i)(A)(II).

To assess a party's earning capacity, the trier-of-fact shall consider the following factors:

(A) child care responsibilities and expenses;

(B) assets;

(C) residence;

(D) employment and earnings history;

(E) job skills;

(F) educational attainment;

(G) literacy;

(H) age;

(I) health;

(J) criminal record and other employment barriers;

(K) record of seeking work;

(L) local job market, including the availability of employers who are willing to hire the party;

(M) local community prevailing earnings level; and

(N) other relevant factors.

Pa.R.C.P. 1910.16-2(d)(4)(ii).

"After assessing a party's earning capacity, the trier-of-fact shall state the reasons for the assessment in writing or on the record." Pa.R.C.P. 1910.16-2(d)(4)(i)(C).

Here, the trial court found that Father had not exerted substantial good faith efforts to find employment commensurate with his background and experience. The trial court stated that the evidence showed Father had only applied to seven jobs in the preceding three-month period. Further, the trial court credited Mother's claim that Father stated he would rather go to jail rather than make support payments to her.

Father testified that, in total he had unsuccessfully applied for "25 or 26" jobs. *See* N.T. Trial, 7/10/2023, at 61. Father also stated that he had "interviewed" three times during his job search, but not to discuss specific positions; rather, the interviews were more akin to informal networking meetings with Father's priest and friends about his prospects moving from his field of construction management to the finance industry. *See id*. In addition,

Father consulted with headhunters and his alma mater's career counselling office to help him secure employment. *See id*., at 57-59. It was Father's preference to continue working in the construction industry, but due to an economic downturn and the alleged theft of funds by his former accountant, he did not believe that this was a viable option.[3]

On June 2, 2023, which was about five weeks prior to the trial *de novo* held on July 01, 2023, Father met with Mother's vocational expert, Brian Bierley. At that meeting, Father presented proof that he had applied for seven positions in the prior three months. Bierley stated that, in his opinion, he did not consider Father's efforts to be "an active job search." *Id*., at 93.

Nevertheless, Bierley testified that he believed that Father's background would make him a strong candidate for a job in finance as a loan officer, an occupation which Father had expressed an interest in. However, Bierley stated that the seven jobs Father had applied to were all "VP positions for [financial] institution[s] and also construction manager positions." *Id*., at 96.

In Bierley's view, Father had the necessary skills and experience to work in finance:

> The bottom line is, it's my belief [Father] has the earning capacity
> of [$]100,000 to [$]120,000. I took into account his master's
> degree, average median earnings with someone with a master's

---

[3] Father claimed that he had recently discovered his former accountant embezzled about $850,000.00 from his businesses, making it impossible for them to turn a profit in the near future. *See* N.T. Trial, 7/10/2023, at 25-27. This allegation was not substantiated, and no criminal charges were filed against the accountant. *See id*. at 24-25.

degrees is about [$]83,000. And median is the middle, some earn more, some earn less. With his years of experience, he would earn more than that, that's my opinion.

And, then, I looked into positions that he had indicated he was interested in, loan-type positions, personal loans in the Philadelphia area, D.C. area, that he was already looking for. The area he was already in pursuit of employment. And I found the position is about [$]160,000.

*Id*., at 95-96.

On review of the above evidence, we find no basis to conclude that the trial court abused its discretion as Father asserts. There was a conflict in the evidence as to how diligently Father applied for a new job, as well his qualifications and ability to work in the finance industry. The trial court expressly found that Father's testimony was not credible as to his efforts to secure new employment. Conversely, the trial court found Mother credible when she testified that Father would rather go to jail than pay her child support; the trial court also found Bierley to be credible. Thus, the record supports the trial court's conclusion that Father willfully failed to "maintain appropriate employment," making it proper for the trial court to hold Father to an earning capacity higher than Father's reported income.

Father's second claim is that the trial court derived his earning capacity from the erroneous finding that, prior to 2020, he had earned between $200,000.00 and $400,000.00. He contends that the evidence shows he never earned more than $128,400.00 (in 2018), and that by 2020, Father's business was so devastated by the COVID-19 pandemic that he only earned

$6,867.00 that year. **See** Appellant's Brief, at 35. We again find that no relief is due.

The trial court was permitted to assess Father's actual earnings by considering "all benefits flowing from corporate ownership." **Spahr v. Spahr**, 869 A.2d 548, 552 (Pa. Super. 2005). A court may do so to prevent a business owner from avoiding "a support obligation by sheltering income that should be available for support by manipulating salary, perquisites, corporate expenditures, and/or corporate distribution amounts." **Id**.

Here, the trial court considered evidence that Father's reported earnings had been undervalued due to his use of his businesses' bank accounts as a "personal piggybank." Trial Court Opinion and Order, 8/14/2023, at 2. The record showed that Father received a salary of $164,387.00 in the 2017-2018 tax year, despite that the business had reported a loss in that period of $148.698.00. Further, from July 1, 2022, to April 30, 2023, Father used business funds to make dozens of personal expenditures, such as shopping trips, meals, and vacations that were not business related. The sum of those personal expenditures, when added to Father's reported salary, would have exceeded the trial court's estimated figure for his actual earnings.[4]

___

[4] Father had also received Paycheck Protection Program (PPP) loans in 2020 and 2021 in quarterly pro-rated amounts based on an annual salary of $100,000.00. The trial court accepted this evidence as proof of Father's capacity to earn that amount in those years.

Regardless, the trial court stressed in its 1925(a) statement that Father's earning capacity was not derived from his income prior to 2020. **See** Trial Court 1925(a) Statement, 10/3/2023, at 1-2. It is instead evident from the trial court's reasoning that the reference to Father's earnings during that latter period were being cited only to demonstrate why the trial court believed Father's more recent reported earnings were not credible. **See id**.

Indeed, the trial court found that Father's earning capacity in 2022 and 2023 ($88,500.00 and $88,000.00) was a fraction of what he earned prior to 2020. **See id**., at 3. The trial court expressly relied on Bierley's estimates, **see id**., but held Father to an earning capacity significantly less than what that expert proposed ($100,00.00 to $122,000.00). Thus, since the trial court's findings are supported by the record, we again find there was no abuse of discretion, and that no relief is due.

Father's third claim is that the trial court erred in finding Bierley credible because he did not evaluate the local job market in Central Pennsylvania, where Father resides, when opining on Father's earning capacity. We find no merit in this claim.

Bierley testified at length about his general methodology when making a vocational assessment. This included the aspect of his methodology now in dispute – an emphasis on the job market for a prospective loan officer in Philadelphia and Washington D.C. despite that Father had for many years worked as a construction manager in Central Pennsylvania.

Bierley testified in line with his report (vocational assessment), which was entered into evidence as a trial exhibit. During their vocational interview, Father himself told Bierley that he was focusing his employment search in Philadelphia and Washington D.C., and that he was interested in becoming a loan officer in those cities. In his job application materials, Father emphasized his background in construction, financing, and investment. At the time of his interview with Bierley, Father had applied for finance-related positions in Philadelphia and Washington D.C.

Although Father argues in his brief that Bierley should have instead focused on the Central Pennsylvania job market in Father's field of construction, as well as the fact Father purportedly made a diligent search for finance positions to no avail, these were matters of credibility and evidentiary weight. The record contains no evidence substantiating Father's claim that he applied for numerous jobs other than the seven positions he discussed with Bierley at their vocational interview. Moreover, Bierley's focus on the job markets in Philadelphia and Washington D.C. was consistent with Father's own efforts and represented qualifications in his application materials. The trial court credited the testimony of Bierley, and this Court finds no basis in the record to disturb that finding of fact.[5]

_____

[5] Even assuming Bierley should have incorporated the Central Pennsylvania job market into his vocational assessment, it is not evident that any prejudice would have resulted. Bierley had estimated Father's potential earnings as a
*(Footnote Continued Next Page)*

Father's fourth and final claim is that the trial court erred in relying on statistical data on salaries in the finance industry to determine Father's potential earnings because he had not worked in that field for many years. Once more, we find that Father's claim has no merit and that the trial court did not abuse its discretion.

The record shows that, while Father never worked exclusively in finance, his background certainly overlapped with it in several respects. Father had obtained a degree in that field and worked in that industry after graduating from school. His own application materials highlighted his experience and expertise in finance, demonstrating that he believed, at least at one point, that he was qualified for such employment.[6] Father's position as to his qualifications only changed due to his purported failure to find a job as a loan officer, and the trial court acted within its discretion in finding Father not to be credible regarding the extent of those efforts. Thus, the trial court did not abuse its discretion in assessing Father's potential earnings based on statistical data for the finance industry, and the order on review must stand.

Order affirmed.

_____

loan officer in Philadelphia and Washington D.C. to be between $100,000 to $122,000. The earning capacity figures adopted by the trial court ($88,500.00 and $88,000.00) were markedly *less* than that range.

[6] Additionally, the trial court clarified in its opinion that it was not "holding Father to a vocational capacity only in finance, but also for small and medium sized contracting companies." Trial Court Opinion and Order, 8/14/2023, at 3.

- 15 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 09/10/2024